**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LYNDA MULLEN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CHESTER COUNTY | : | |
| HOSPITAL, | : | No. 14-2836 |
| Defendant. | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**Timothy R. Rice**                                        **April 30, 2015**
**U.S. Magistrate Judge**

Plaintiff Lynda Mullen claims Defendant Chester County Hospital violated the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Pennsylvania

Human Relations Act, 43 Pa. C.S. § 951 et seq. ("PHRA"), by: (1) discriminating against her on

the basis of her disability; (2) failing to provide a reasonable accommodation; and (3) retaliating

against her.  The Hospital seeks summary judgment.

The Hospital's motion is granted in part.  No reasonable jury could find that the Hospital

refused to provide a reasonable accommodation.  Mullen has failed to produce any evidence that

she requested a reasonable accommodation, let alone that her firing was motivated by such

request.  Her claims for discrimination and retaliation, however, survive.  Mullen has produced

sufficient evidence to support reasonable jury determinations that (1) the Hospital's justification

for her firing was pretextual; and (2) the Hospital reported Mullen to the Pennsylvania State

Board of Nursing ("Nursing Board") only after it learned that Mullen planned to challenge her

firing as a violation of her civil rights.

## I.      Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

Where there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. See id. at 250.  "If reasonable minds could differ as to the importance of the evidence, however, a verdict should not be directed." Id. at 250-51.  I must view the facts and any inferences from those facts in the light most favorable to the non-moving party. See Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013); Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010).  Further, I "may not make credibility determinations or engage in any weighing of evidence." Anderson, 477 U.S. at 255.  Bald allegations by the plaintiff, however, lacking corroboration in the record evidence, are not enough to create a factual dispute and sustain a claim. Mimi Ma v. Westinghouse Electric Co., LLC, 559 F. App'x 165, 169 (3d Cir. 2014) (plaintiff's "conclusory statements and opinions" were "legally insufficient to support an inference of pretext.").

## II.     Facts

The following facts are in the light most favorable to Mullen. Burton, 707 F.3d at 425.

Mullen worked for the Hospital for approximately seven years, first as a unit secretary, then as a nursing assistant, and finally as a registered nurse ("RN"). Mullen Dep. (Ex. F to Def.

Br.) (doc. 39) at 84-88; Pl.'s Aff. (Ex. B. to Pl. Br.) (doc. 41) ¶ 3.[1]  As an RN, she initially worked night shifts on the telemetry unit, but switched to weekend daytime shifts on the Hospital's West Wing 1 unit ("WW1") at the end of 2012.  Mullen Dep. at 42.  Mullen had positive reviews during her employment and had never been formally disciplined.  See Mullen Dep. at 88; Holman Dep. (Ex. C to Def. Br.) at 15-16; Nguyen Dep. (Ex. D to Pl. Br.) at 14.

Mullen has Lupus and a congenital heart defect and these conditions occasionally cause her to become dizzy, lightheaded, and faint.  Mullen Dep. at 8, 98, 178-84; Pl.'s Aff. ¶¶ 6-9.  Mullen notified the Hospital about her conditions at least as early as February 2008, Ex. E to Pl. Br. at P-SJR-176, and was provided with various accommodations, including a leave of absence and the ability to miss work without formally incurring absences.  Pl.'s Aff. ¶ 6; Compl. (doc. 1) ¶ 20.  Mullen also had been treated by the Hospital's "rapid response team" and in the Hospital's emergency room at least three times after experiencing symptoms at work before 2012.  Mullen Dep. at 178-80; Pl.'s Aff. ¶ 8.

On March 2, 2013, Mullen became nauseous and informed her weekend supervisor, Amy Nguyen.  Mullen Dep. at 32; Pl.'s Aff. ¶ 10.  Nguyen told Mullen to go on break and reassign her patients.  Mullen Dep. at 32; Pl.'s Aff. ¶ 11.  While doing this, Mullen either collapsed or began to faint.  Mullen Dep. at 32; Pl.'s Aff. ¶ 12; but see Compl. ¶ 13 (she was "near fainting"); Marais Dep. (Ex. L to Def. Br.) at 8, 11 (Mullen sat down, either in a chair or on the floor, near the nurse's station and had low oxygen levels).  Other nurses, including Shelly McComsey and

---

[1]     Mullen was deposed on October 14, 2014.  See Mullen Dep.  She completed an affidavit averring to various facts in this case on March 11, 2015, and filed it in response to the Hospital's motion for summary judgment.  See Mullen Aff.  Any facts contained in the affidavit that are contrary to Mullen's deposition testimony not credited in assessing the Hospital's motion for summary judgment.  See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007)  (sham affidavit submitted in response to a motion for summary judgment "cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant").

Taryn Marais, helped Mullen to an empty patient bed where they took her vital signs and treated her with saline solution through an I.V.[2]  Compl. ¶ 14; Mullen Dep. at 205-10, 218; Pl.'s Aff. ¶¶ 12-14.  The nurses did not call a "rapid response," the Hospital's procedure for treating an employee or visitor before bringing them to the emergency room for further care, or obtain a doctor's order to provide treatment.  Mullen Dep. at 205-10; Pl.'s Aff. ¶¶ 12-14.  Mullen felt "out of it" while these actions were taking place, and could not adequately express herself, Mullen Dep. at 206-07; Mullen Aff. ¶ 15, but subsequently regained her composure and was sent home, Mullen Dep. at 221-23; Mullen Aff. ¶ 16.

In June 2013, Jacqueline Felicetti, the head of the Hospital's human resources department, received an anonymous letter alleging that Mullen had been placed in an empty patient room and given an I.V. by Shelley McComsey and other nurses.  See Anonymous Letter (Ex. A to Def. Br.); Felicetti Dep. (Ex. B to Def. Br.) at 36-37.  Leigh Holman, a nurse manager, and Cathy Weidman, the director of medical and surgical services, investigated the incident and, along with Felicetti, met separately with Mullen, McComsey, and Marais.  Mullen Aff. ¶ 18; Felicetti Dep. at 39-47.

After learning of the meeting, Mullen exchanged several text messages with other Hospital nurses, including McComsey and Marais.  In a June 12, 2013 text exchange, Mullen asked another nurse, Jami Wilkins, if Wilkins knew what the meeting would be about.  See Ex. H to Def. Br. at P373.  After learning from Wilkins that the meeting might be about the March 2 incident, Mullen texted: "[Are you] serious?  It was [just] [intravenous fluids] . . . .  [You] think

---

[2]      The parties agree that a registered nurse's administration of any medication without a physician's order – including oxygen or intravenous saline solution – violates the Pennsylvania Professional Nursing Law and constitutes practice outside the scope of a nursing license in the state of Pennsylvania.  Def. Br. at 9; Mullen Dep. at 169-70; see also Def. Br. at Ex. E (opinion of nursing expert).

I'll get in trouble.  I know it was wrong.  But it was saline.  I'm so scared.  Amy even sent me home that day."  Id.  Mullen acknowledged that the incident involved: "[t]wo other nurses and no [doctor]."  Id.

During the Hospital's investigation, Holman determined that the incident must have occurred on March 2, 2013.  Def. Br. at ¶ 15-16; Anonymous letter.  Holman then spoke with one nurse who had nothing to tell her, five nurses who had heard about the event but seen nothing, one nurse who had seen Mullen lying down, and a nursing assistant who had seen Mullen in the patient room.  Holman Dep. at 59-66.  Holman did not ask these nurses whether they had taken Mullen's vital signs or seen the I.V.  Id.

Weidman spoke with Nguyen, who acknowledged being told that Mullen was sick and calling in a replacement for her, but denied knowing about the I.V. or seeing Mullen with an I.V. Weidman Dep. (Ex. D to Def. Br.) at 8.  Weidman also spoke with one nurse who had heard about the event but seen nothing, another nurse who had only heard Mullen had been sick, and a nursing assistant who was unaware of the incident.  Id. at 10.  Another nurse, Linda Esbanshade, told Weidman she knew that Mullen had been vomiting, had a headache, and had received an I.V.  Id. at 11.  Weidman did not ask Esbanshade how she knew this information, or whether she had personally witnessed the I.V. insertion.  Id. at 11-12.  Holman and Weidman eventually identified Marais as the nurse who had inserted the I.V.  Def. Br. ¶¶ 16-19; Weidman Dep. at 10.

The administrators also kept Vice President of Nursing Angela Coladonato informed of their investigation.  Weidman Dep. at 84.  Coladonato spoke to Nguyen about Mullen's health condition, and her history of needing short breaks on the job and of leaving shifts early due to health concerns.  Nguyen Dep. at 17-18, 30-32.  According to Mullen, Coladonato was the "ultimate decision maker" who fired her.  Pl. Br. at 5 n.2.

Mullen, Marais, and McComsey met separately with Felicetti, Weidman, and Holman on June 13, 2013, more than three months after the incident.  Def. Br. at ¶ 21.  The parties' accounts of what took place during those meetings differ substantially.  The administrators contend that, at McComsey's meeting with them, McComsey claimed she had only escorted Mullen to a patient room, had not been involved in Mullen's care, and was not present when the I.V. was inserted.  Id. at ¶ 27.  McComsey's deposition testimony was consistent.  McComsey Dep. (Ex. I to Def. Br.) at 25-27.

Contemporaneous notes of the meeting taken by Weidman, however, report McComsey stating that Mullen was sick but refused to go to the emergency room, and that McComsey "helped place" Mullen in the patient room and took her vital signs.  Weidman Notes (Ex. J to Def. Br.) at 195.  Mullen and Marais, meanwhile, testified that McComsey helped Mullen get to the patient room and was present when Marais inserted the I.V.  Marais Dep. at 12, 16; Mullen Dep. at 7.

During her meeting, McComsey showed administrators texts she had received from Mullen.  Def. Br. at ¶ 24  The texts appear to inform McComsey, for the first time, about the I.V., state McComsey had "done nothing wrong," and predict that only Mullen and Marais would be fired for placing the I.V.  Id.  Mullen also had texted McComsey that she wished she had just "let" her co-workers call a rapid response.  Mullen Dep. at 61.[3]  McComsey was not disciplined.  Weidman Dep. at 8.

---

[3]    In her deposition, Mullen minimized her text messages.  She explained that: (1) she texted that she expected to be fired only because she usually assumes the worst; (2) she conceded McComsey had not known about the I.V. only because McComsey "plays dumb" and Mullen does not waste her time arguing with her; and (3) the text about wishing she had "let" her co-workers call a rapid response really meant she wished the other nurses, who had been in charge of her care at that time, had called a rapid response.  Id. at 59-61.

Mullen contends she told the administrators at her meeting that she was "out of it" when the I.V. was placed and was incapable of refusing treatment, but the administrators pressured her to admit that she had asked for the I.V., implying that she was too sick to work.  Mullen Dep. at 64-66.  Mullen claims she told the administrators that their interrogation of her constituted disability discrimination.  Id. at 65.  She testified the administrators "badger[ed]" her to admit that she asked for the I.V., and kept "telling [her] what happened, telling [her] about her illnesses, [her] sickness."  Id. at 64-65.  According to Mullen, the administrators also brought up other health incidents she had experienced at work.  Id. at 65.  The day after she was fired, Mullen texted Nguyen that "[t]hey said I'm unsafe at work [because] I [obviously] can't get through a shift without [I.V. fluids] or [oxygen]."  Nguyen Dep. at P-SJR-130.

All three administrators, however, contend Mullen was apologetic and admitted wrongdoing.  Holman Dep. at 85.  Felicetti and Holman testified they left the series of meetings believing Mullen had asked for the I.V.  Holman Dep. at 94 (either Mullen or Marais or both said Mullen asked for the I.V.); Felicetti Dep. at 90 (Mullen admitted asking for the I.V.).  Weidman did not remember anyone reporting that Mullen had asked for the I.V., and her contemporaneous notes of the meeting do not state that Mullen admitted asking for the I.V.  Weidman Dep. at 21; Weidman Notes at 195-96.  All three believed, however, that Mullen had admitted refusing to go to the emergency department or allowing the "rapid response" team to be called.  Weidman Dep. at 21; Holman Dep. at 91; Felicetti Dep. at 70.

Mullen also testified that during the meeting, the administrators had assured her they would not report her to the Nursing Board because they believed she had good intentions. Mullen Dep. at 66.  She also received a text from Marais later, after Marais had spoken with a representative from the Hospital's human resources department, that said Marais had been told

she would be reported to the Nursing Board, but Mullen would not.  Id. at 6.  At her deposition, Mullen denied previously administering oxygen to herself, or ever self-medicating.  Id. at 62.  In Weidman's contemporaneous notes of the meeting with Mullen, Weidman disputed this claim, noting that Mullen had admitted using oxygen on a previous occasion and that placing the IV "was wrong and she should have gone to the [emergency room]."  Weidman Notes at 195.

Marais admitted to administrators that she had placed the I.V. without a physician's order.  Marais Dep. at 71.  She was fired immediately.  Id. at 73.  Marais denied telling the administrators that Mullen had asked for an I.V. and denied that Mullen had made the request.  Id. at 92, 96-97.  She nevertheless insisted she had Mullen's informed consent to perform the procedure.  Id. at 52 ("I would assume I did [get Mullen's consent to insert the I.V.] because I would not have done it against her will.").  She further testified that Mullen had not wanted to "abandon her patients" by going to the emergency room before a shift change, but stopped short of agreeing that Mullen had "refused" emergency care.  Id. at 45, 100.  Weidman's notes of the meeting state Marais told them Mullen "refused to go to the [emergency room] or for a Rapid Response to be called," but do not reference Mullen asking for the I.V.  Weidman Notes at 195-96.  Marais stated that when she asked the administrators whether they intended to report her to the Nursing Board, they were noncommittal.  Id. at 99.

Felicetti, with Weidman present, called Mullen that evening and fired her.  Felicetti Dep. at 77.  The Hospital contends Mullen was fired "for her involvement in the provision of medical care outside the scope of her license," which consisted of "permit[ting] a co-worker to administer intravenous medication to her" when she "was sentient" and "should have been aware of the violation of both Hospital protocol and the scope of her nursing license."  Hospital's Response to Interrogatory (Ex. M. to Def. Br.) at 4.  According to Mullen, Felicetti also assured her that the

Hospital would not contest her unemployment benefits.  Mullen Dep. at 268.  Felicetti could not recall making any statement regarding unemployment benefits, but admitted offering Mullen extended health benefits.  Felicetti Dep. at 75.  She also denied agreeing not to report Mullen to the Nursing Board.  Id.  According to Weidman's notes, Mullen was upset during the call and "stated she was not aware of what the nurses were doing with her" when she had received the I.V.  Weidman Notes at 196.  At Felicetti's direction, Mullen called her back the next morning, June 14, 2013, and Mullen again expressed her opinion that she had been unfairly fired based on others' actions.  Felicetti Dep. at 78.

Almost a month later, on July 10, 2013, Mullen visited the Hospital's human resources department to obtain copies of the paperwork related to the intermittent leave she had been granted pursuant to the Family Medical Leave Act ("FMLA").  Pl.'s Aff. ¶ 24; Ex. H to Pl. Br. at P-SJR-262 (receptionist note that Mullen had visited and requested FMLA paperwork for her lawyer on 7/10/13).  Felicetti began the process of reporting Mullen to the Nursing Board that same day.  Second Felicetti Dep. (Ex. H to Pl. Br.) at 12.  The Hospital's report to the Nursing Board regarding Mullen stated that Mullen "refused to let other employees take her to the Emergency Department for care and did not allow the staff to call a rapid response on her."  Id. at P-SJR-255.  It also stated that Mullen "asked Taryn Marais to insert an IV in her as she lay in a bed to get rehydrated."  Id.

### III.   Discussion

#### A.  Mullen's Discrimination Claim

The Hospital argues summary judgment should be granted because Mullen was fired for violating hospital policy, not based on her disability.  Def. Br. at 1.

The ADA prohibits discriminating against "qualified individuals" because of their disability with respect to "discharge." 42 U.S.C. § 12112(a).  It defines discriminating to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability."  Id. at § (b)(3)(A).

Mullen suggests two theories for her discrimination claim.  The first is a direct discriminatory intent theory: that because Mullen suffered from a disability which periodically interrupted the Hospital's nursing schedule, administrators used the anonymous complaint "to get rid of [its] 'problem' employee."  Pl. Br. at 13.  According to this theory, when it terminated Mullen for participating in care necessitated by her disability, the Hospital effectively terminated her for having a disability.  Pl. Br. at 3.  The second is a disparate impact theory: that terminating Mullen for allowing out-of-scope medical practice, but not disciplining McComsey or any of the other nurses who were allegedly present for the I.V. insertion, and in a better state of mind to prevent it, singled Mullen out for termination based on her disability.  Id. at 14.

To prove direct discrimination, Mullen must produce evidence from which a reasonable jury could conclude that the decision-makers at the Hospital intended to fire her, at least in part, because of her disability.  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) (describing evidence required to establish a "mixed-motive" discrimination case).  Mullen has presented evidence that Angela Coladonato, the Hospital's chief nursing officer, was informed of Mullen's history of taking breaks and leaving shifts early for health reasons before she was terminated.  Nguyen Dep. at 30-31.  Mullen also testified that, during her meeting with Felicetti, Holman, and Weidman, she was pressured to admit she had requested the I.V., and that the administrators suggested she was too sick to continue working at the Hospital.  Mullen Dep. at 257, 265; Nguyen Dep. at P-SJR-130.  Finally, she has also produced evidence that she was so

sick on March 2, 2013, that she collapsed, threw up, and was not in a position to "participate" in the medical decisions made regarding her care.  Mullen Dep. at 32; Marais Dep. at 8, 11.

A reasonable jury could credit Mullen and Marais, who claim that Mullen did not request an I.V. and was suffering symptoms that could justify her inability to deny treatment, rather than McComsey, Felicetti, Holman, Weidman, and Colodonato, who claim Mullen acknowledged seeking unlicensed medical care in violation of state law.  J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) (credibility determinations are reserved for juries, and are improper for judges to make at summary judgment).

A reasonable jury could also credit Mullen's version of the meeting with administrators rather than the version described by Felicetti, Holman, and Weidman.  Although Mullen cannot survive summary judgment based solely on her own uncorroborated allegations, Mimi Ma, 559 F. App'x at 169, the inconsistencies in the administrators' recollections of the meeting, compare Weidman Dep. at 21 with Felicetti Dep. at 90, along with Mullen's near-contemporaneous texts, Nguyen Dep. at P-SJR-130, provide a basis on which a reasonable jury could find Mullen's version of events more credible than the Hospital's.  Finally, the jury could also reasonably draw a negative inference regarding the Hospital's motivation based on the information Nguyen provided Coladonato about Mullen's multiple disability-related absences.  Nguyen Dep. at 17-18, 30-32.  A reasonable jury could find that one of the Hospital's motivations for firing Mullen was the administrators' belief that she was too sick to work.  Mullen Dep. at 256-57; Nguyen Dep. at P-SJR-130.  Wagner v. Dillard Dept. Stores, Inc., 17 Fed.Appx. 141, 151 (4th Cir. 2001) (affirming denial of judgment as a matter of law because reasonable jury could have found discriminatory intent based on reported comments).

Mullen's disparate impact discrimination theory is assessed under the McDonnell-Douglas burden-shifting framework. Frank v. PNC Financial Services Group, Inc., No. 13-3846, 2015 WL 1222487, *1 (3d Cir. March 18, 2015). Mullen must establish a prima facie claim by showing: (1) she has a disability (2) but is otherwise qualified to do her job, and (3) she has suffered some adverse action related to her employment. Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998). The burden then shifts to the Hospital to provide a non-discriminatory explanation of the adverse action. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). Mullen must then provide sufficient evidence to allow a reasonable jury to conclude that the Hospital's non-discriminatory justification, i.e. knowingly engaging in the unlicensed practice of medicine while on duty, was a mere pretext for discrimination. Fuentes v. Perski, 32 F.3d 759 (3d Cir. 1994); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996).

The critical factual issue is whether a reasonable jury could find the Hospital decision-makers were on notice that Mullen was incapable of refusing the prohibited I.V. when they decided to fire her. If they were, it could support Mullen's disparate impact theory of discrimination, since the Hospital failed to discipline McComsey, who administrators had been told participated in caring for Mullen, and failed to even investigate Esbenshade's level of participation in the unlicensed care. Weidman Dep. at 11-12. Neither McComsey nor Esbenshade had any disability and were not disciplined. For summary judgment purposes, the Hospital does not contest Mullen's claim that she has a covered disability, and given the uncontroverted positive reviews of her job performance and her immediate supervisor's[4] positive

---

[4]     The Hospital disagrees that Nguyen, the weekend supervisor, was Mullen's direct superior. Def. Br. at 18 n.5; Pl. Br. at 23 n.9. Because Mullen is entitled to every reasonable inference, I will assume that she is correct.

opinion regarding her skills, she has established the second element as well.  Def. Br. at 3; Pl. Br. at Ex. C (Holman 1); Nguyen Dep. at 22.  Mullen suffered an adverse employment action when she was fired, establishing a prima facie case of disability discrimination.

Viewing the facts in the light most favorable to Mullen, I must assume: (1) the Hospital knew of Mullen's disability; (2) during the incident, Mullen "collapsed," or "felt out of it," and was vomiting; (3) Mullen needed to be escorted to the patient room, and was incapable of refusing medical care; (4) the I.V. was inserted by Marais, not Mullen; (5) Mullen never asked for the I.V.; (6) neither Mullen nor anyone else told the Hospital she asked for the I.V. before she was fired; (7) during the meeting with administrators Mullen was pressured to admit she had asked for the I.V. and the administrators discussed whether Mullen was too sick to continue working; and (8) no discipline was imposed on McComsey, Esbenshade, or any other nurse who admitted seeing Marais administer oxygen or I.V. saline to Mullen.

Mullen has presented sufficient evidence from which a reasonable jury could find pretext. The Hospital's non-discriminatory justification itself contains inconsistencies on which a jury, if it believed Mullen's version, could conclude pretext.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 145-46 (2000) (evidence of prima facie case combined with evidence that puts non-discriminatory justification in doubt is sufficient to support jury determination in favor of plaintiff).  Felicetti and Holman testified they left the meeting with Mullen believing Mullen had asked Marais to insert the I.V.  Felicetti Dep. at 90; Holman Dep. at 94.  Weidman, Mullen, and Marais, however, corroborated by Weidman's notes, believed Mullen had never asked for the I.V.  Weidman Dep. at 21; Weidman Notes at 195-96; Mullen Dep. at 64-66; Marais Dep. at 92, 96-97.  Weidman testified only that she believed Mullen had "participated" in the unlicensed care by allowing it to occur while she was "sentient," or capable of making decisions, Weidman

Dep. at 87-88, but Weidman also testified that she had not asked the other nurses about Mullen's mental capacity, id. at 68.  A reasonable jury could find the Hospital's justification inconsistent with its claim that Mullen had knowingly permitted a co-worker to provide unlicensed medical care, and therefore conclude the justification was merely pretext for disability discrimination.  In re Unisys Sav. Plan Litigation, 74 F.3d 420, 435 (3d Cir. 1996) (overturning grant of summary judgment for breach of fiduciary duty when facts regarding the course of the fiduciary's investigation were disputed).

Whether Mullen permitted unlicensed medical care by refusing emergency treatment is a disputed issue of material fact.  The three administrators claim Mullen had "refused" to go to the emergency room or allow her colleagues to call a rapid response.  Weidman Dep. at 21; Holman Dep. at 91; Felicetti Dep. at 70.  Weidman's contemporaneous notes corroborate this understanding.  Weidman Notes at 195-96.  So do Mullen's texts to McComsey, in which Mullen referenced wishing she had just "let" her colleagues call a rapid response, and recognizing that she and Marais would be fired.  Def. Br. at Ex. H, p. P376; Mullen Dep. at 240.  At her deposition, however, Marais never testified that Mullen refused a rapid response or emergency room visit that her colleagues recommended, but rather acknowledged that, in an effort not to "abandon her patients," Mullen had insisted on staying on the unit until she gave a shift-change report.  Marais Dep. at 45, 100.  According to Mullen, by the time she was receiving the I.V., she was incapable of making medical decisions.  Mullen Dep. at 260.  Mullen explained in a text to Nguyen around that time that she "didn't know all that was going on" during the incident because she "was [t]ryin[g] to not throw up and not pass out."  Pl. Br. at 28.  A reasonable jury could conclude that Mullen never refused medical care recommended by her colleagues.

Even if the jury concluded Mullen had refused care, however, it could still reasonably conclude the Hospital's non-discriminatory justification for her firing was pretext. The Hospital has cited no policy that Mullen could have violated merely by refusing treatment. Not does it claim that it fired Mullen for exercising poor medical judgment with respect to her own health or endangering patients by working in a compromised condition. See, e.g., Emberger v. Deluxe Check Printers, No. 96-7043, 1997 WL 677149, *6 (E.D. Pa. 1997) (granting summary judgment when notes revealed employer was aware of connection between plaintiff's disability and misconduct, but "was compelled to terminate" due to legitimate concern for another employee's safety). Instead, the Hospital claims Mullen was fired "for her involvement in the provision of medical care outside the scope of her nursing license." Hospital's Response to Interrogatory at 4. The Hospital alleged only that Mullen "permitted a co-worker to administer intravenous medication to her when she felt faint" and "was sentient at times when she should have been aware of the violation of both Hospital protocol and the scope of her nursing license." Id.

Whether Mullen was sentient at the time the I.V. was placed is hotly contested. J.F. Feeser, 909 F.2d at 1531. Mullen contends she told the administrators she was so "out of it" that she was unable to participate in the faulty decisions made regarding her care. Mullen Dep. at 219-21. Ebenshade, the only bystander nurse who admitted seeing Mullen in the patient room, testified that she was unable to observe Mullen's condition on the day Mullen received the I.V. Ebenshade Dep. (Ex. L to Pl. Br.) at 17. Weidman's contemporaneous notes from her interview with Ebenshade, however, show that Ebenshade said Mullen "was vomiting and had a headache." Weidman Notes at 195. Marais also testified that Mullen collapsed, was vomiting, and had such low oxygen saturation levels that her colleagues immediately provided her oxygen. Marais Dep. at 41-44.

A reasonable jury could conclude that the facts available to the administrators were that Mullen attempted to stay at her post as long as she could in an effort not to abandon her patients, the decision to give her an IV was made by her colleagues, and she was unable to object to its insertion.  Accepting Mullen's version of events, a reasonable jury could find evidence of pretext, especially because McComsey was not fired for her role in the incident; Marais, the only other person fired besides Mullen, admitted to placing the I.V.; and Esbenshade was not even questioned as to her role in Mullen's care.

A reasonable jury could find the Hospital's non-discriminatory justification was so "weak[], implausib[le], inconsisten[t] or incoheren[t]" that it could support a jury finding that it was merely a pretext covering a discriminatory intent.  Fuentes, 32 F.3d at 765; see also Reeves, 530 U.S. at 145-46; Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006) (overturning summary judgment granted to employer because, by casting "substantial doubt" on several of the employer's non-discriminatory justifications, the plaintiff's evidence, including his own version of events, provided evidence sufficient to support a jury determination in his favor); Belcastro v. Sears, Roebuck & Co., No. 06-1721, 2009 WL 532533, at *12 (W.D. Pa. March 3, 2009) (denying summary judgment when management-level employees testified inconsistently about non-discriminatory justification and plaintiff could point to disparate treatment of those outside the protected class).

The Hospital's Motion is denied as to Counts I and II.

B.  Failure to Accommodate

Mullen's failure to accommodate theory appears to be that, by telling Nguyen she felt sick on March 2, 2013, Mullen requested that the Hospital accommodate her by providing emergent medical care, and when she met with administrators on June 13, 2013, she requested

16

another accommodation of lenient discipline.  Those events, she claims, obligated the Hospital to engage in the interactive process regarding an accommodation.  Pl. Br. at 34.

This theory has no basis in law or fact.  A request to allow illegal medical practice is not reasonable, and a request to allow an illegal act cannot, logically, qualify as a request for a reasonable accommodation.[5]  If Mullen had simply requested to leave early, or had requested leave to obtain medical care from the emergency room, her request would have been granted without repercussion, as it had been before.  Nguyen Dep. at 17, 23.  A request to receive medical care in violation of state licensing standards, however, would have properly been denied.  Id. at 18.  The Hospital is not required to excuse a violation of state licensing law.  Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC, Oct. 17, 2002, available at: http://www.eeoc.gov/policy/docs /accommodation.html#other (last visited April 13, 2015) (there is no obligation to "withhold discipline or termination of an employee who, because of a disability, violated a conduct rule that is job-related for the position in question and consistent with business necessity") ("Enf. Guidance").  See also Solomon v. School Dist. of Philadelphia, 532 F. App'x 154, 158 (3d Cir. 2013) (school district was not required to provide the accommodation requested when it had already offered a reasonable alternative).

Moreover, Mullen has produced no evidence that she requested any accommodation in her meeting with Weidman, Holman, and Felicetti.  To the extent that Mullen's behavior constituted a request for approval or excuse of the behavior, these are legally invalid requests for

---

[5]    To the extent Mullen genuinely believes the Hospital should have allowed her to authorize her own I.V. fluids or oxygen as an accommodation, she undermines her own prima facie case by establishing that she is not an "otherwise qualified individual" under the ADA. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998) (plaintiff was not an "otherwise qualified individual" because his proposed accommodation was impractical and therefore "unreasonable as a matter of law").

a reasonable accommodation.  Gaul, 134 F.3d at 580; Enf. Guidance.  The only time her actual disability-based accommodations appear to have come up at all during the meeting with administrators was when Mullen explained that the accommodating schedule the Hospital had already provided – working weekend days rather than her previous weeknight schedule – had been helpful in improving her health.  Weidman Notes at 195 (Mullen "stated that her health had improved since she started working dayshift").  No reasonable jury could find that the Hospital failed to provide Mullen a reasonable option for accommodating her illness, and failure to engage in the interactive process, by itself, is not a viable cause of action.  See Solomon, 532 F. App'x at 158 (once employee had rejected offer that would have reasonably accommodated employee's disability, "alleged failure to further investigate into reasonable accommodation is unimportant") (citing Gaul, 134 F.3d at 581).

The Hospital's motion for Summary Judgment on Counts III and IV is granted.

C. Retaliation

To establish a retaliation claim, Mullen must show: (1) a protected action; (2) an adverse employment action; and (3) a causal link.  Krouse v. American Sterilizer Co.,126 F.3d 494, 500 (3d Cir. 1997).  Mullen advances two theories for her retaliation claim: (1) the termination itself was retaliation for the previously-granted accommodation of intermittent FMLA leave; and (2) the report to the Nursing Board was retaliation for Mullen's pursuit of this lawsuit.  Pl. Br. at 40-41.

The first theory is meritless.  Mullen's intermittent FMLA leave expired on March 9, 2013.  Pl. Br. at 32, Pl.'s Aff. at ¶ 6.  There is no evidence that the Hospital began investigating the March 2, 2013 incident until the anonymous complaint was received in early June.  Other than Mullen's supposition, no facts link her firing to her previously-granted intermittent FMLA

18

leave.  There is insufficient evidence to survive summary judgment.  <u>Mimi Ma</u>, 559 F. App'x at 169.

The second theory is legally supportable.  Although it is based on actions taken by the Hospital after Mullen had been fired, such post-termination activity may form the basis for a retaliation claim if it would impinge on the plaintiff's ability to obtain future employment. <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997) (former employees can bring Title VII retaliation claims to deter "the threat of postemployment retaliation"); <u>see also</u> <u>Fasold v. Justice</u>, 409 F.3d 178, 188-89 (3d Cir. 2005) (overturning district court grant of summary judgment to employer for retaliation claim based on post-termination conduct); <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 501 (3d Cir. 1997) (ADA retaliation claims are analyzed under same framework as Title VII retaliation claims).

As long as a plaintiff has demonstrated a protected activity and a potentially retaliatory act, a jury must decide whether the action taken is of the kind that could "dissuade a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 57 (2006).  The cases that hold otherwise either base their reasoning on an inconsistent timeline, <u>Brenner v. Harleysville Ins. Cos.</u>, No. CIV.A. 01–08, 2002 WL 31185758, *10 (E.D. Pa. Sept. 30, 2002), or allege acts that cannot be described as retaliatory, <u>Glanzman v. Metropolitan Management Corp.</u>, 391 F.3d 506 (3d Cir. 2004) (finding no retaliation against apartment manager who was fired for "a surfeit of legitimate reasons" and whose employer then contested her unemployment benefits and asked her to vacate her rent-free apartment).  A reasonable jury could conclude that an employer acted in a retaliatory manner by reporting a fired employee to a licensing board on the same day the former employee threatened to file a discrimination lawsuit.  The timing is especially troubling here, where the licensing

board report was not made for almost a month and only begun contemporaneously with the threat of litigation.

Mullen was told during the meeting with the administrators that she would not be reported to the Nursing Board.  Mullen Dep. at 262.  Although the Hospital disputes this fact, Felicetti Dep. at 75, Mullen's account is corroborated by contemporaneous texts from Marais, Def. Br. at Ex. H, p. P378.  Moreover, the evidence shows that, after being fired on June 13, 2013, Mullen visited the Hospital on July 10, 2013, requesting documentation to support a lawsuit.  Pl. Br. at Ex. H, (CD-3).  Although Felicetti claimed that reporting Mullen to the Nursing Board was "not optional," Felicetti Dep. at 75, and was accomplished "within a few days" after Mullen was terminated, id. at 28, Felicetti actually began drafting the report only on July 10, 2013, and submitted it sometime the following month, Pl. Br. at Ex. H, pp. 13-14.  See also Orders and Letters from November 2014 (docs. 16-31).

An ADA discrimination suit need not be successful for its filing to be a protected activity, it need only be filed in objectively reasonable good faith.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (citing Clark Cnty. v. Breeden, 532 U.S. 268, 271 (2001)).  Filing this suit was a protected activity.  Reporting Mullen to the Nursing Board for practicing outside the scope of her license was a materially adverse employment action, because it is the kind of activity that could dissuade Mullen from filing a charge of discrimination in the future.  Burlington, 548 U.S. at 68.

The "[u]nusually suggestive" temporal proximity between the protected activity and the adverse action – both on the same day – may alone be sufficient to create an inference of causality and defeat summary judgment.  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81, 284

(3d Cir. 2000)).   In addition to the close temporal proximity, Mullen has produced evidence that

the Nursing Board complaint included information – that Mullen had requested the I.V. – that

was not confirmed by all three administrators involved in the termination decision, and was

disputed by Mullen and Marais.   This is sufficient evidence for a reasonable jury to conclude that

the report was made in retaliation for Mullen's protected activity.   Marra v. Philadelphia Housing

Authority, 497 F.3d 286, 307 (3d Cir. 2007) (suspicious timing and circumstances regarding

termination sufficient to sustain jury finding for plaintiff); Tomasso v. Boeing Co., 445 F.3d 702,

709 (3d Cir. 2006) (summary judgment denied because the factual dispute involved whether the

employer's explanation was implausible or merely mistaken); Sheridan v. E.I. DuPont

deNemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (jury may draw inference of intentional

discrimination from evidence of pretext).

      The Hospital's Motion for summary judgment on Mullen's Retaliation claims is denied.